1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CLAY MORRISON,                         No.  2:09-cv-1544 MCE DAD P

12                    Plaintiff,

13         v.                                ORDER AND

14    J.M. PRENTICE et al.,                  FINDINGS AND RECOMMENDATIONS

15                    Defendant.

16

17         Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18    42 U.S.C. § 1983.  This matter is before the court on a motion for summary judgment brought

19    pursuant to Rule 56 of the Federal Rules of Civil Procedure by defendants Prentice and Gomez.

20    Plaintiff has filed an opposition to the motion, and defendants have filed a reply.  For the reasons

21    discussed herein, the court will recommend that defendants' motion for summary judgment be

22    granted in part and denied in part.

23         Also pending before the court is defendants' motion for the imposition of sanctions on the

24    grounds that plaintiff has filed a declaration with the court that purportedly contains false

25    statements made under penalty of perjury.  Plaintiff has not filed an opposition or otherwise

26    responded to this motion.  For the reasons discussed herein, the court will deny defendants'

27    motion for sanctions.

28    /////

                                               1

1

## BACKGROUND[1]

Plaintiff is proceeding on a third amended complaint in this civil rights action.  Therein, plaintiff alleges that on November 27, 2007, defendant correctional officers Prentice and Gomez broke his arm in "a form of police brutality" and denied him medical attention.  In terms of relief, plaintiff requests the award of damages.  (Third Am. Compl. (Dkt. No. 22) at 5.)

The court as well as the parties in this case have liberally construed plaintiff's complaint to state claims against defendants for excessive use force and deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment.

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

---

[1]  Plaintiff filed this action in 2009, but the case has only now reached the summary judgment stage due to unusual circumstances that the undersigned will note herein.  By order filed May 24, 2010, the court dismissed plaintiff's second amended complaint and granted him thirty days leave to amend.  (Doc. No. 18.)  After the thirty-day period had expired and the court had not received a third amended complaint from plaintiff, the court issued findings and recommendations on July 7, 2010, recommending that the action be dismissed without prejudice. (Doc. No. 19.)  On August 19, 2010, the assigned district judge adopted those findings and recommendations in full and entered judgment on the same day.  (Doc. Nos. 20 & 21.)  Almost twenty months thereafter, on April 17, 2012, the court received plaintiff's third amended complaint and a motion for the appointment of counsel. (Doc. Nos. 23 & 24.)  Attached to these documents was a letter from the warden of California State Prison, Sacramento dated April 11, 2012, wherein the warden stated merely that "It recently came to my attention that the enclosed letter had not yet been delivered to you.  Upon learning of this, I ensured the letter was promptly delivered."  (Doc. No. 22 at p. 1.)  This same letter was received by this court in connection to many other civil rights and habeas actions filed here.  Plaintiff's third amended complaint that was forwarded to the court by the warden was, in fact, dated June 19, 2010.  On April 24, 2012, the undersigned directed plaintiff to notify the court whether he wished to pursue this action.  (Doc. No. 24.)  On May 2, 2012, plaintiff indicated to the court that he did wish to continue to pursue this civil rights action.  (Doc. No. 25.)  On November 6, 2012, the assigned district judge vacated the judgment in this case and referred the matter back to the undersigned.  On November 15, 2012, the undersigned issued an order for service of defendants Prentice and Gomez.

2

1   The moving party may accomplish this by "citing to particular parts of materials in the record,

2   including depositions, documents, electronically store information, affidavits or declarations,

3   stipulations (including those made for purposes of the motion only), admission, interrogatory

4   answers, or other materials" or by showing that such materials "do not establish the absence or

5   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

6   support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden

7   of proof at trial, "the moving party need only prove that there is an absence of evidence to support

8   the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

9   See also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after

10  adequate time for discovery and upon motion, against a party who fails to make a showing

11  sufficient to establish the existence of an element essential to that party's case, and on which that

12  party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure

13  of proof concerning an essential element of the nonmoving party's case necessarily renders all

14  other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so

15  long as whatever is before the district court demonstrates that the standard for entry of summary

16  judgment, . . ., is satisfied." Id. at 323.

17      If the moving party meets its initial responsibility, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

19  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

20  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

22  admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

23  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

24  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

26  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

27  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

28  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## OTHER APPLICABLE LEGAL STANDARDS

I. Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

/////

4

1   omits to perform an act which he is legally required to do that causes the deprivation of which

2   complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

3   Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

4   their employees under a theory of respondeat superior and, therefore, when a named defendant

5   holds a supervisorial position, the causal link between him and the claimed constitutional

6   violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

7   Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations

8   concerning the involvement of official personnel in civil rights violations are not sufficient. See

9   Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

10  II. The Eighth Amendment and Excessive Use of Force and Inadequate Medical Care

11  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S.

12  Const. amend. VIII. The "unnecessary and wanton infliction of pain" constitutes cruel and

13  unusual punishment prohibited by the United States Constitution. Whitley v. Albers, 475 U.S.

14  312, 319 (1986). See also Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429

15  U.S. 97, 105-06 (1976). Neither accident nor negligence constitutes cruel and unusual

16  punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that

17  characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley, 475

18  U.S. at 319.

19  What is needed to show unnecessary and wanton infliction of pain "varies according to

20  the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992)

21  (citing Whitley, 475 U.S. at 320). To prevail on an Eighth Amendment claim the plaintiff must

22  show that objectively he suffered a "sufficiently serious" deprivation. Farmer v. Brennan, 511

23  U.S. 825, 834 (1994). "[A] prison official's act or omission must result in the denial of 'the

24  minimal civilized measure of life's necessities.'" Id.; Wilson v. Seiter, 501 U.S. 294, 298-99

25  (1991). The plaintiff must also show that subjectively each defendant had a culpable state of

26  mind in allowing or causing the plaintiff's deprivation to occur. Farmer, 511 U.S. at 834.

27  It is well established that "whenever prison officials stand accused of using excessive

28  physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry

1    is that set out in <u>Whitley</u>, i.e., whether force was applied in a good-faith effort to maintain or

2    restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 6-7. The

3    court should consider several factors to determine whether a use of force violates the Eighth

4    Amendment, including the need for force, the relationship between the need for force and the

5    amount of force used, and the extent of the threat the officers reasonably perceived the plaintiff

6    posed. <u>See Whitley</u>, 475 U.S. at 321. A prisoner is not required to show a "significant injury,"

7    <u>see Hudson</u>, 503 U.S. at 9-10, but "an inmate who complains of a 'push or shove' that causes no

8    discernible injury almost certainly fails to state a valid excessive force claim." <u>Wilkins v. Gaddy</u>,

9    559 U.S. 34, 38 (2010).

10        It is also well established that when prison officials are accused of providing inadequate

11   medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to

12   evidence deliberate indifference to serious medical needs." <u>Estelle</u>, 429 U.S. at 106. An Eighth

13   Amendment medical care claim has two elements: "the seriousness of the prisoner's medical

14   need and the nature of the defendant's response to that need." <u>McGuckin v. Smith</u>, 974 F.2d

15   1050, 1059 (9th Cir. 1991), <u>overruled on other grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d

16   1133 (9th Cir. 1997) (en banc).

17        A medical need is serious "if the failure to treat the prisoner's condition could result in

18   further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin</u>, 974

19   F.2d at 1059 (quoting <u>Estelle</u>, 429 U.S. at 104). Indications of a serious medical need include

20   "the presence of a medical condition that significantly affects an individual's daily activities." <u>Id.</u>

21   at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the

22   objective requirement for proving an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 834.

23        If a prisoner establishes the existence of a serious medical need, he must then show that

24   prison officials responded to the serious medical need with deliberate indifference. <u>See</u> <u>Farmer</u>,

25   511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny,

26   delay, or intentionally interfere with medical treatment, or may be shown by the way in which

27   prison officials provide medical care. <u>Hutchinson v. United States</u>, 838 F.2d 390, 393-94 (9th

28   Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to

1  medical care, however, "the indifference to his medical needs must be substantial.  Mere
2  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."
3  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at
4  105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere
5  negligence in diagnosing or treating a medical condition, without more, does not violate a
6  prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate
7  indifference is "a state of mind more blameworthy than negligence" and "requires 'more than
8  ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

9       Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.
10  at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a
11  plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th
12  Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059;
13  Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198,
14  200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.
15  1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would
16  provide additional support for the inmate's claim that the defendant was deliberately indifferent to
17  his needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

18       Finally, mere differences of opinion between a prisoner and prison medical staff or
19  between medical professionals as to the proper course of treatment for a medical condition do not
20  give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi,
21  391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891
22  F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

23  III.  Qualified Immunity

24       Government officials enjoy qualified immunity from civil damages unless their conduct
25  violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 U.S. 895, 910
26  (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is
27  presented with a qualified immunity defense, the central questions for the court are:  (1) whether
28  the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

1  defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

2  was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001).

3       The United States Supreme Court has held that "while the sequence set forth there is often

4  appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223,

5  236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

6  statutory or constitutional violation, "there is no necessity for further inquiries concerning

7  qualified immunity." Saucier, 533 U.S. at 201.  Likewise, if a court determines that the right at

8  issue was not clearly established at the time of the defendant's alleged misconduct, the court may

9  end further inquiries concerning qualified immunity at that point without determining whether the

10  allegations in fact make out a statutory or constitutional violation.  Pearson, 555 U.S. at 236-242.

11       "A government official's conduct violate[s] clearly established law when, at the time of

12  the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

13  official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd,

14  ___U.S.___, ___131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635

15  (1987)).  In this regard, "existing precedent must have placed the statutory or constitutional

16  question beyond debate."  Id.  See also Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002)

17  ("The proper inquiry focuses on  . . . whether the state of the law [at the relevant time] gave 'fair

18  warning' to the officials that their conduct was unconstitutional.") (quoting Saucier, 533 U.S. at

19  202).  The inquiry must be undertaken in light of the specific context of the particular case.

20  Saucier, 533 U.S. at 201.  Because qualified immunity is an affirmative defense, the burden of

21  proof initially lies with the official asserting the defense.  See Harlow, 457 U.S. at 812.

22                    **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

23       Counsel on behalf of defendants Prentice and Gomez has moved for summary judgment

24  on the grounds that the evidence establishes that:  (1) defendants did not intend to cause plaintiff

25  harm; (2) defendants' actions did not constitute excessive use of force under the Eighth

26  Amendment; (3) defendants did not break plaintiff's arm; (4) defendants were not deliberately

27  indifferent to plaintiff's serious medical needs; and (5) defendants are entitled to qualified

28  immunity.  (Defs.' Mem. of P. & A. at 8-16.)

1    Defendants Prentice and Gomez have submitted a statement of undisputed facts supported

2    by declarations signed under penalty of perjury by both themselves as well as Officer Ngo,

3    Officer Wooden, Dr. Chaiken, and Dr. Dowbak.  Defendants' statement of undisputed facts is

4    also supported by citations to a transcript of plaintiff's deposition and to plaintiff's medical

5    records.  The evidence submitted by the defendants in support of their motion for summary

6    judgment establishes the following.

7    Plaintiff is a state prisoner serving a sentence of seven years to life in state prison for

8    murder.  Plaintiff has been in the prison mental health delivery system for the past 20 years at the

9    Enhanced Outpatient Program ("EOP") level of care.  The California Department of Corrections

10   and Rehabilitation has multiple levels of care to provide inmates access to mental health services.

11   The EOP is the highest outpatient level and provides the most intensive level of outpatient

12   medical care within the Mental Health Services Delivery System.  The EOP is characterized by a

13   separate housing unit and structured activities for mentally ill inmate-patients who, because of

14   their illness, experience adjustment difficulties in the mainline setting.  These inmates are not so

15   impaired as to require 24-hour patient care.  (Defs.' SUDF 1-3, Chaiken Decl., Pl.'s Dep.)

16   Mentally ill inmate-patients requiring 24-hour inpatient care are housed in the Mental

17   Health Crisis Bed Unit ("MHCB").  When no MHCB bed is available, a mentally-ill inmate-

18   patient requiring 24-hour inpatient care may be housed in the Outpatient Housing Unit ("OHU").

19   The OHU is a special needs housing unit.  The cells in OHU are single-cells with a toilet and sink

20   inside the cell, and a window on the cell door designed to permit careful observation of the

21   inmate.  The cells are virtually empty to minimize the likelihood that the inmate could modify an

22   item and use it to kill himself or otherwise inflict serious bodily harm upon himself or others.  For

23   safety and security reasons, prison officials conduct unclothed body searches on inmates before

24   housing them in OHU.  (Defs.' SUDF 4-5, Chaiken Decl.)

25   A Probate Code 2602 order also known as a Keyhea order is a court-issued injunction for

26   involuntary medication of an inmate who, due to a mental disorder, is incompetent to refuse

27   medication.  For approximately the last eight to nine years, plaintiff has been under a Keyhea

28   order and thus has been judicially declared incompetent to refuse psychotropic medication.

1   Plaintiff has hallucinations:   voices urging him to "kill people to hurt people . . . to fight," and

2   making him do things he does not want to do.  Due to the hallucinations, plaintiff has committed

3   assaults, cell fights, and arson.  Hallucinations have also caused plaintiff to assault officers.

4   Plaintiff has been housed at Atascadero State Hospital twice and numerous times at the

5   Department of Mental Health facility in Vacaville, California.  (Defs.' SUDF 6-11, Chaiken

6   Decl., Pl.'s Dep.)

7        On November 27, 2007, plaintiff was housed in the B-8 EOP Unit at California State

8   Prison, Sacramento.  At approximately 11:00 a.m., Officer Ngo ordered plaintiff to return to his

9   cell after shower program.  Plaintiff refused Officer Ngo's direct orders, walked over to a table in

10  the dayroom, and sat down.  Officer Ngo informed floor staff that plaintiff refused to return to his

11  cell.  Officers Lee and Key entered the section, and plaintiff said:  "You can spray me or do what

12  you have to do, but I am not locking up."  Officers Lee and Key nonetheless persuaded plaintiff

13  to return to his cell.  While returning to his cell, plaintiff said: "Next time, you're going to need a

14  real gun because you're going to need it."  Plaintiff received a Rules Violation Report ("RVR") in

15  connection with this incident involving Officer Ngo, and prison officials subsequently found

16  plaintiff guilty of refusing a direct order.  (Defs.' SUDF 12-16, Ngo Decl., Pl.'s Dep.)

17       Later that afternoon during count, plaintiff was sitting on his toilet and had spat on all the

18  windows in front of his cell.  During chow, plaintiff threw his dinner tray back out of the food

19  slot.  Then, plaintiff urinated on the tier through the food slot.  During plaintiff's deposition,

20  plaintiff testified regarding that incident and stated:  "Let them clean it up.  I wasn't going to

21  clean it up.  Somebody's got to clean it up, but it wasn't going to be me."  Plaintiff also refused to

22  take his anti-psychotic medication that day stating, "I am not going to take a motherfucking thing.

23  I'm not taking nothing.  You take that shit."  Plaintiff then left the front of his cell, laid down on

24  the lower bunk, and began ignoring medical staff.  (Defs.' SUDF 17-22, Wooden Decl., Pl.'s

25  Dep.)

26       Due to plaintiff's erratic behavior, medical staff told Unit B-8 Floor Officer Wooden that

27  plaintiff needed to be re-housed in OHU.  B-Facility Sergeant Stewart notified Lieutenant Just to

28  report to Unit B-8 to help escort plaintiff to OHU.  Plaintiff initially refused to come to the food

port and "cuff up." Lieutenant Just was able to talk plaintiff into submitting to the handcuffs. Defendant Prentice was the B-Facility Search and Escorts Officer whose duties included escorting B-Facility inmates to other parts of the prison. Officers Prentice, Wooden, Just, Stewart, and Deeds helped escort plaintiff to the B-8 Rotunda while medical staff prepared his medications. (Defs.' SUDF 23-27, Wooden Decl.)

Plaintiff was very agitated and verbally combative, calling the escort officers "Dirty fucking pigs." Plaintiff also stated: "Mind your own fucking business and see what happens when you take off these cuffs!" Plaintiff became irritated with Officer Prentice and asked for someone else to escort him. Lieutenant Just had Officer Deeds take over escorting plaintiff from Officer Prentice. Plaintiff was escorted from the B-8 Rotunda to the OHU by Officer Deeds while Sergeant Stewart, Officer Prentice, and Officer Wooden followed close by. Throughout nearly the entire escort, plaintiff made threats, cussed and swore at staff, and refused to cooperate. Plaintiff was clearly not in control of his emotions or behavior. Plaintiff was a real and present danger to every officer conducting the escort. During the escort from the B-8 Rotunda to OHU, plaintiff made several threats directed at Officer Wooden. Specifically, plaintiff stated: "I'm going to kill you Wooden," and "I'm going to kill you Wooden as soon as these cuffs come off, you're a dead motherfucker. I can't wait until I get a chance to kill you." Threatening an officer is a prison rules violation and can result in an RVR. (Defs.' SUDF 28-34, Wooden Decl.)

At OHU, the officers needed to perform an unclothed body search on plaintiff before placing him in a cell. Sergeant Stewart asked plaintiff to take off his shoes by instructing him to kick each shoe off with the opposite foot. Plaintiff said, "Take the fucking cuffs off and I will." Sergeant Stewart told plaintiff, "That isn't going to happen, either you kick your shoes off or we'll assist you." Plaintiff said "Fuck you!" Sergeant Stewart ordered staff to lay a mattress down and put plaintiff on it. The officers assisted plaintiff to kneel and then lie down on the mattress. Plaintiff was in handcuffs and leg restraints, which prevented his clothing from being removed. When an inmate is uncooperative, threatening, and cannot be safely uncuffed and unshackled for an unclothed body search, his clothes must be cut off. Correctional staff removed plaintiff's shoes and cut his clothes off with scissors. Medical staff gave plaintiff an emergency

1   injection and placed a spit mask over his face.  (Defs.' SUDF 35-40, Chaiken Decl., Wooden

2   Decl., Pl.'s Dep.)

3        Lieutenant Just and Officers Prentice, Wooden, and Hatch escorted plaintiff to cell FB1-

4   216 where Officer Gomez was waiting by the cell door with a retention chain.  The purpose of a

5   retention chain is to control the inmate's movements and to get the handcuffs back after the

6   inmate is uncuffed.  The retention chain prevents the inmate from pulling the handcuffs inside a

7   cell after one wrist is unlocked.  Handcuffs with one wrist unlocked can be used as a weapon by

8   an inmate.  Plaintiff has seen the retention chain used on other inmates who were agitated,

9   frustrated, and angry.  (Defs.' SUDF 41-43, Wooden Decl., Pl.'s Dep.)

10       At cell FB-216, plaintiff was ordered to get onto his knees and stay facing the back of the

11  cell.  Officer Wooden took off plaintiff's leg restraints and left.  Officer Gomez hooked up the

12  retention chain to plaintiff's handcuffs through the food port.  Plaintiff was kneeling, facing the

13  back wall of the cell.  Officer Prentice ordered plaintiff to crawl into his cell and stay on his knees

14  until the door was closed and the handcuffs were removed.  Officer Hatch reached inside the cell

15  and took off the spit mask.  Immediately, plaintiff tried to turn around and face the officers.

16  Officer Prentice slowly pulled on the retention chain with the necessary force to keep plaintiff

17  from turning towards the officers.  Officer Prentice felt that it was necessary to keep close control

18  of plaintiff to prevent him from harming him or another officer.  Officer Prentice continued

19  holding onto the retention chain with both hands until he felt Officer Gomez take the slack out of

20  the retention chain behind him.  At that time, Officer Prentice felt it was safe to let go of the

21  retention chain.  (Defs.' SUDF 44-49, Wooden Decl., Gomez Decl., Prentice Decl., Pl.'s Dep.)

22       Plaintiff remained on his knees near the door.  Officer Prentice told plaintiff to put his

23  hands through the food port, so the officers could remove the handcuffs.  Plaintiff refused to

24  comply.  Officer Gomez slowly pulled the retention chain with the necessary force to overcome

25  plaintiff's resistance.  Once his hands and wrists were outside the food port, an officer removed

26  the handcuffs and closed the food port.  During and after the retention chain procedure, plaintiff

27  did not appear to be in pain, did not complain that he was in pain, and did not otherwise indicate

28  /////

1    that he was in pain.  (Defs.' SUDF 50-52, Wooden Decl., Gomez Decl., Prentice Decl., Pl.'s

2    Dep.)

3            The type of fracture plaintiff incurred is extremely painful.  The fact that plaintiff did not

4    appear to be in pain, complain, or make any vocalizations indicating that he was in pain indicates

5    that plaintiff's fracture did not occur at that time.  Plaintiff did not know his arm was broken, and

6    he did not feel or hear anything snap.  The fact that plaintiff did not feel or hear anything snap

7    when the retention chain was pulled also indicates that plaintiff's fracture did not occur at that

8    time.  Dr. Dowbak declares that without exception the hundreds of patients he has treated with

9    similar fractures to plaintiff's felt the bone break.  In most cases, the patient also heard a snapping

10   sound.  (Defs.' SUDF 53-55, Dr. Dowbak Decl., Pl.'s Dep.)

11           After plaintiff was uncuffed, he stood up and looked at the officers through the window.

12   Plaintiff did not speak to them, and they did not speak to him.  Plaintiff reported his injury the

13   next day after breakfast.  The type of fracture to plaintiff's right humeris indicates compression,

14   which is consistent with a fall.  The type of fracture to plaintiff's right humeris is not consistent

15   with plaintiff's claim that defendants caused it by pulling on the retention chain.  Plaintiff does

16   not know whether defendant Gomez or defendant Prentice broke his arm.  According to

17   defendants, they did not intend to cause plaintiff any injury.  (Defs.' SUDF 56-62, Dr. Dowbak

18   Decl., Wooden Decl., Gomez Decl., Prentice Decl., Pl.'s Dep.)

19           Plaintiff received an RVR for threatening Officer Wooden on November 27, 2007.

20   Prison officials later found him guilty of threatening a peace officer and assessed him 60 days

21   loss of good-time credits.  Plaintiff never had the good-time credits restored.  Nor has a court set

22   aside the disciplinary findings.  (Defs.' SUDF 63-64, Wooden Decl., Pl.'s Dep.)

23                                          **ANALYSIS**

24           The court will first address defendants' argument that they are entitled to summary

25   judgment on plaintiff's excessive use of force claim.  Next, the court will turn to defendants'

26   argument that they are entitled to summary judgment on plaintiff's deliberate indifference

27   medical care claim.  Finally, the court will take up defendants' argument that they are entitled to

28   summary judgment based on the affirmative defense of qualified immunity.

1  I.  Plaintiff's Excessive Use of Force Claims

2        Based on all of the evidence presented in connection with the pending motion for

3  summary judgment, and for the reasons stated below, the undersigned concludes that defendants

4  are not entitled to summary judgment in their favor on plaintiff's excessive use of force claims.

5  Specifically, even assuming for the sake of argument that defendants have met their initial

6  responsibility of demonstrating that no reasonable juror could conclude that they used excessive

7  force against plaintiff in violation of the Eighth Amendment, plaintiff has submitted a declaration

8  signed under penalty of perjury describing a very different set of facts than that described by

9  defendants' evidence.

10        According to plaintiff, on November 27, 2007, at approximately 11:00 a.m., he refused

11  Officer Ngo's orders to lock up after his shower because he had a problem to address with

12  correctional staff, but they ignored him and refused to listen to him.  After Officers Lee and Key

13  came to the section, he spoke to them, and having felt that the issue was resolved, he returned to

14  his cell.  During the course of the day, several correctional officers, including defendant Prentice,

15  taunted and harassed plaintiff, which caused him to become agitated and act out by throwing his

16  food tray out of the food port and urinating on the tier.  Plaintiff refused to take his medication as

17  a way to get a sergeant to come to his cell and hear his complaint about officers taunting and

18  harassing him.  (Pl.'s Decl. at 1-2.)

19        Once Lieutenant Just arrived, plaintiff submitted to handcuffs and explained his problem

20  to him.  Plaintiff did not make threatening statements towards Officer Wooden.  Nor did he cause

21  officers any problems during his escort to OHU.  Plaintiff acknowledges that he was somewhat

22  agitated, but he had calmed down a lot after Lieutenant Just arrived and spoke to him.  Once

23  plaintiff arrived at OHU, Sergeant Stewart ordered him to kick off each shoe with the opposite

24  foot.  Plaintiff explained to him that he could not do so with handcuffs because he was wearing

25  "high top" basketball shoes, and he had to unlace them with his hands to take them off.  Sergeant

26  Stewart asked him again, and plaintiff replied "Fuck you."  (Pl.'s Decl. at 2.)

27        According to plaintiff, there was no need to cut his clothes off of him.  In addition, there

28  was no need for a spit mask because he did not exhibit the type of behavior that would warrant its

1  use.  Plaintiff does not know who took off his leg restraints because he was facing the opposite

2  direction, but once his spit mask was taken off, plaintiff tried to turn around to identify all of the

3  officers involved in his escort.  According to plaintiff, that is when defendant Prentice pulled real

4  hard on the retention chain and broke his arm.  In plaintiff's view, defendant Prentice pulled on

5  the retention chain with unnecessary force.  Plaintiff was on his knees with his back towards the

6  door.  Defendant Prentice pulled on the retention chain a second time after defendant Gomez had

7  loosened the retention chain.  Plaintiff did not resist defendant Prentice's orders and tried to

8  comply, but defendant Gomez also pulled hard on the retention chain.  In plaintiff's view,

9  defendant Gomez also had no justifiable need to pull on the retention chain so hard.  (Pl.'s Decl.

10  at 3.)

11      At the time defendant Prentice pulled on the retention chain, plaintiff felt severe pain but

12  did not immediately notice that his arm was broken because his adrenaline was rushing, and he

13  was agitated.  Plaintiff's anger and focus were on defendants Prentice and Gomez.  Plaintiff did

14  not hear his arm break at the time of the incident because there was too much noise from the

15  retention chain scraping against the side of the cell food port and correctional staff yelling and

16  cursing at him.  (Pl.'s Decl. at 3-4.)

17      None of the correctional staff involved in the incident or assigned to OHU would listen to

18  plaintiff's complaints of pain in his arm.  He had to wait until breakfast the next day to notify

19  correctional staff on the new shift to complain about the pain and to receive medical treatment.

20  Plaintiff declares that he felt pain in his right arm right after the incident with defendants Prentice

21  and Gomez, and at no time did plaintiff fall on his right arm after the incident with the

22  defendants.  (Pl.'s Decl. at 4.)

23      On defendants' motion for summary judgment, the court is required to believe plaintiff's

24  evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.

25  The court may not weigh the parties' evidence or determine the truth of the matters asserted by

26  the parties; rather the court is required only to determine whether there is a genuine issue of

27  material fact appropriately resolved by trial.  See Summers v. A. Teichert & Son. Inc., 127 F.3d at

28  1152.  Here, drawing all reasonable inferences in plaintiff's favor, the court finds that plaintiff has

1    submitted sufficient evidence to create a genuine issue of material fact with respect to his

2    excessive use of force claims against defendants Prentice and Gomez.

3           Defense counsel argues that the court should grant summary judgment in defendants'

4    favor because plaintiff admitted that defendants did not intend to cause him harm.  In this regard,

5    defense counsel contends that during his deposition, plaintiff testified as follows:

6                  Q:  Do you think Prentice intended to break your arm?

7                  A:  No.  I don't think he intended to break my arm . . . I think the
                   arm breaking, I think that was an accident. . . .
8

9                  Q.  When they were pulling on the chain, they weren't intending to
                   break your arm.  Do you think they were attempting to cause you an
                   injury?
10

11                 A.  I don't know what their intentions was.  I don't know what their
                   frame of mind was.
12   (Pl's Dep. at 45.)

13          The court is not persuaded by defense counsel's argument.  As discussed above

14   "whenever prison officials stand accused of using excessive physical force in violation of the

15   Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley, i.e.,

16   whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

17   and sadistically to cause harm."  Hudson, 503 U.S. at 6-7.  The Ninth Circuit has also emphasized

18   that '[t]he correctly-stated standard . . . is whether the defendants applied force "maliciously and

19   sadistically for the very purpose of causing harm,' – that is any harm."  Robins v. Meecham, 60

20   F.3d 1436, 1441 (9th Cir. 1995).

21          In Robins, a prisoner-plaintiff brought a § 1983 action against correctional officers

22   alleging excessive force in violation of the Eighth Amendment because he was injured when

23   Officer Meecham fired a shot at another inmate, and it ricocheted and hit the prisoner-plaintiff.

24   See id. at 1438.  In that case, the Ninth Circuit rejected defendants' argument that "the standard of

25   wantonness that inmate Robins must establish in his use of force claim . . . is that defendants

26   acted towards him maliciously and sadistically for the purpose of causing him harm."  See id. at

27   1441.  The Ninth Circuit explained that "[t]his subtle but critical misstatement of the appropriate

28   standard would require that the defendants act with specific intent rather than general intent."  See

1   id.  The court held that prison officials can be liable under the Eighth Amendment "so long as

2   they have a specific intent to harm."  See id. at 1441.  As such, the Ninth Circuit concluded that

3   "[w]hom the prison officials shot, Robins or Echavarria, is not relevant – what is relevant is that

4   they fired a gunshot blast at an inmate."  See id.

5        Here, as an initial matter, plaintiff has submitted a declaration with his opposition to

6   defendants' motion for summary judgment in which he clarifies that his statement that he did not

7   believe defendants intended to break his arm was not correct.  (Pl.'s Decl. at 5.)  Plaintiff declares

8   that he believes that defendants acted with malicious intent.  (Id.)  Moreover, under Robins, even

9   if defendants in this case did not specifically intend to break plaintiff's arm, under at least one

10  version of the facts, defendants nevertheless applied force with the very type of malicious and

11  sadistic conduct that the Eighth Amendment is designed to prohibit.  That is, a reasonable jury

12  could conclude that defendants intended to punish plaintiff during the escort and applied force

13  "maliciously and sadistically for the very purpose of causing harm,' – that is *any* harm."  Robins,

14  60 F.3d at 1441.

15       At his deposition, plaintiff testified as to his version of events:

16           A:  They didn't have no reason to put the retention chain on me.  I
             wasn't hostile.  I wasn't resisting.  I was cooperating with
17           everything they said, even though they cut my clothes off, which
             wasn't necessary.  They was doing that as a form of punishment.
18           They was trying to punish me for instigating a hostile situation with
             one of the coworkers.
19

             Q:  Okay.  Now you mentioned that your arm was broken.  How did
20           that occur?  Do you remember?

21           A:  I remember exactly how it occurred.  When I got to the cell,
             after they escorted me up the stairs to the cell, they told me to kneel
22           down inside the cell.  And I still had what they call a spit mask on
             my head; right?  Okay.  I kneeled down inside the cell.  When they
23           took the spit mask off, I looked up to see who this particular officer
             was.  And when I looked up to see who the particular officer was,
24           they pulled on the retention chain as the door was closing, at the
             same time the door was closing.  I wanted to see who this particular
25           officer was.  You know what I'm saying?  And when I looked up.
             That's when he pulled the retention chain.  That's when they broke
26           my arm.  My arm was broke so sever[e], they had to surgically
             repair it.  I still got the scars on my arm today and for the rest of my
27           life.

28  (Pl.'s Dep. at 28.)

1      Plaintiff also testified that after defendants removed his handcuffs, defendant Prentice

2   smiled at him and pointed to his name tag as if to brag or boast as to what had transpired.  (Pl.'s

3   Dep. at 30.)  According to plaintiff, defendant Prentice in particular was acting "gung-ho" and

4   had engaged in other forms of unnecessary force during the escort.  At his deposition, plaintiff

5   described the events:

6           A:  They took me from the housing unit that I was in over to what
            they call MOHU, which was what you were talking about.  It's a
7           mental health crisis unit because I had refused to take my
            medication.  And I was under a Keyhea order – I didn't have the
8           opportunity to refuse the medication – order, so they cuffed me up
            and took me to what they call downstairs to the rotunda, gave me
9           my medication, which I did take, and then escorted me to the
            MOHU, which is the crisis bed.
10
            And once I got to the crisis bed, they laid me on the ground, cut off
11          all my clothes, put a spit mask over my head, and held me to the
            ground until they had opened the cell that they were going to put
12          me in; right?  At this time I'm not resisting.  I'm not verbally
            disrespectful.  I'm not saying nothing.  I'm just going with the flow;
13          right?

14          But Officer Prentice had both of his knees on my head and was
            holding me down as if I was resisting.  You know what I'm saying?
15          But I wasn't resisting, because I didn't do nothing wrong.  I was
            going to talk to the doctor the next day or whenever I get back into
16          the unit.  But Officer Prentice was holding me down with both
            knees on my head.
17
            So, okay, after they cut off all my clothes, they injected me with
18          another shot of medication.  I don't know what it was, but I had
            previously took my medication, and they gave me some more
19          medication.  Then they put – they escorted me up the stairs, butt
            naked, walked up the stairs to the cell.  And when I got to the cell,
20          they put what they call a retention chain, so that you can't snatch
            the handcuffs into the cell . . . .
21

22   (Pl.'s Dep. at 16-17.)

23      Based on plaintiff's evidence reflecting his version of the facts, which the court is required

24   to believe on defendants' motion for summary judgment, a reasonable juror could conclude that,

25   regardless of whether defendants specifically intended to break plaintiff's arm, defendants acted

26   maliciously and sadistically for the purpose of causing plaintiff harm, "that is *any* harm" Robins,

27   60 F.3d at 1441, in violation of the Eighth Amendment.

28   /////

18

1    Defense counsel also argues that the defendants are entitled to summary judgment on

2    plaintiff's excessive use of force claim because the "Hudson factors" mitigate in their favor.  For

3    example, defense counsel argues that the defendants did not break plaintiff's arm – the injury is

4    not consistent with pulling on a retention chain.  In addition, counsel argues that defendants

5    needed to pull on the retention chain to keep plaintiff under control.  Specifically, counsel

6    contends that plaintiff's conduct on the day in question was erratic and menacing, and he refused

7    to take his anti-psychotic medication and cooperate with officers.  Counsel also argues that the

8    type of force defendants used was appropriate under the circumstances and that defendants

9    reasonably perceived that plaintiff was a threat to them because he made repeated verbal threats

10   during the escort.  Finally, counsel argues that defendants made efforts to temper their response to

11   plaintiff's conduct by switching his escorting officer, putting a mattress down before they

12   conducted an unclothed body search, and using a retention chain instead of resorting to baton

13   strikes or more violent methods.  (Defs.' Mem. of P. & A. at 9-13.)

14   Of course, on summary judgment the court may not weigh the parties' evidence or

15   determine the truth of the matters asserted by the parties; rather the court is required only to

16   determine whether there is a genuine issue of material fact appropriately resolved by trial.  See

17   Summers v. A. Teichert & Son. Inc., 127 F.3d at 1152.  As discussed above, based on the

18   evidence relied upon by plaintiff in opposing summary judgment, the undersigned finds that there

19   are material questions of fact in dispute surrounding defendants' alleged excessive use of force

20   against plaintiff, including the amount of force defendants used, the extent of plaintiff's injuries

21   as a result of the defendants' use of force, and the circumstances under which the defendants used

22   that force.

23   Finally, defense counsel argues that the court should grant summary judgment in

24   defendants' favor because they did not break plaintiff's arm.  (Defs.' Mem. of P. & A. at 13.)

25   Defense counsel relies on a declaration from Dr. Dowbak submitted by defendants in which the

26   doctor opines that defendants did not break plaintiff's arm because:

27        A.  The fracture shown in the X-rays is not consistent with the
          purported mechanism of injury.

28

B.  Morrison would have felt (and probably heard) the bone break.

C.  Morrison's reaction during and immediately after the incident is inconsistent with a fracture of this type.

(Dowbak Decl.)  Dr. Dowbak explains that the type of fracture plaintiff suffered in his right arm is "not consistent" with plaintiff's claim that defendants caused it by pulling on the retention chain.  (Id.)  Rather, he finds that plaintiff's fracture is more consistent with a fall.  (Id.)  If plaintiff did sustain a fracture during the alleged incident with defendants, Dr. Dowbak maintains that "the pain would have been so dramatic, immediate and severe as to be obvious to all.  Morrison would have likely been screaming or crying."  (Id.)  At the time of the alleged incident, defense counsel contends that plaintiff did not appear to be in pain, complain, or make any vocalizations indicating that he was in pain, and he did not feel or hear anything snap when the defendants pulled the retention chain.  (Defs.' Mem. of P. & A. at 13.)

Once more, plaintiff's version of the facts regarding his injury and the extent of pain he felt at the time of the alleged incident is, not surprisingly, quite different than defendants' account.  In his deposition, plaintiff testified as follows:

Q:  I do.  So after they un-handcuffed you, then you turned around and looked in the window to see who it was?

A.  Right.

Q:  Did you say anything?  Do you remember saying anything?

A:  I said nothing.  I was in pain.  I was in serious pain.  My arm was killing me.  I didn't know it was broken at the time.  I was in pain.

I didn't say nothing to them.  I didn't want them to come in and further assault me.  You know what I'm saying?  Because there was like eight or nine of them standing at the door, and I couldn't defend myself because I was in so much pain.  You know what I'm saying?  I didn't say nothing to them.  They didn't say nothing to me.

They walked away, and then they tried to deny me medical attention after I'm trying to talk to – after they all left, the next time I seen a nurse to come back to my cell, I tried to tell the nurse I'm in pain.  I need some pain medication, Tylenol or something, because my arm was hurting, and they refused me medical attention till the next day.

20

1       I slept on the floor, on the toilet.  I slept on the floor in the toilet all
night.  They didn't have no mattress in the cell, no blanket, no

2       nothing.

3       The next day I talked to a nurse, and the nurse told me that she was
going to get my arm x-rayed.  And when they x-rayed it, they found

4       out it was broke, and then escorted me to a hospital on the street.

5       Q.  I see.  Did a nurse come up and ask you if you had any injuries,
and then you refused to answer her?

6

7       A.  No.

8       Q:  Okay.

9       A.  Didn't nobody come till the next day.

10      Q:  Okay.  When you were – okay.  Let's go back.  You're
kneeling, and your hands are behind you.  The retention chain is on.
They took the spit mask off, and you turned up to look, and they

11      pull on it right as they're closing the door; right?

12      A:  Right.

13      Q:  At what point did your arm break?

14      A:  When he was pulling on it.  As soon as I looked up, as soon as
they took the spit mask off, I looked up, and he pulled.  As soon as

15      I looked up to see who the hell the officer was, that's when they
broke my arm.  That's when they pulled the retention chain so hard,

16      they broke my arm.  You know what I'm saying?  As soon as I
looked up.

17      Q:  Did your arm hit anything?  Did it hit the door?

18

19      A:  No. No.

20      Q:  Did you feel anything snap?

21      A:  I didn't feel nothing snap.  I didn't hear nothing snap.  The only
thing I knew, when I took the handcuffs off, I had to use my left
arm to support my right arm because I was in so much pain.  Any

22      time I would move in any kind of way, the pain would be
excruciating.  You know what I'm saying.

23

24      I was in so much pain that I had to sleep on the toilet.  I couldn't
even lay on my arm till the next day.  I stayed up all night pacing

25      back and forth in the cell until they came with the new staff.

26      After they changed shifts, the new staff came, and I tried to explain
to the nurse that I'm in pain.  You know what I'm saying?  Because
I didn't know my arm was broke at the time.  I just knew I was in

27      pain.  You know what I'm saying?

28   (Pl.'s Dep. at 32-35.)

As discussed above, there are material questions of fact in dispute with respect to the amount of force defendants used, the extent of plaintiff's injuries as a result of the defendants' use of force, and the circumstances under which the defendants used that force. If plaintiff can establish at trial that defendants' use of force was excessive, then the question of whether their force led to plaintiff's broken arm or some lesser injury is a question for the jury. See, e.g., M.H. v. County of Alameda, No. 11-cv-02868-JST, 2014 WL 1429720 at *34 (N.D. Cal. Apr. 11, 2014) ("If Plaintiffs can establish at trial that the deputies used excessive force, the question of whether the force led to Harrison's death or merely to some of his injuries will be a question of fact for the jury."); Finch v. Lopez, No. ED CV 10-1440-BRO (PJW), 2013 WL 2898055 at *3 (C.D. Cal. June 11, 2013) ("Though Plaintiff may have difficulty establishing the extent of his injuries on his testimony alone and differentiating those injuries from his prior complaints, he certainly has presented sufficient evidence on causation at this stage to survive summary judgment."); see also Seals v. Mitchell, No. CV 04-3764 NJV, 2011 WL 1399245 (N.D. Cal. Apr. 13, 2011) ("Plaintiff is correct that he is not required to present a medical expert to establish his § 1983 excessive force case.").[2]

Accordingly, for all of the foregoing reasons, defendants' motion for summary judgment on plaintiff's excessive use of force claim should be denied.[3]

/////

_____

[2] Of course, a jury may ultimately decide that defendants did not break plaintiff's arm by pulling on the retention chain, and instead, plaintiff broke his arm in some other way before the next morning. For purposes of summary judgment, however, this court finds that there is sufficient evidence to indicate that defendants' actions caused plaintiff's injury.

[3] The Ninth Circuit has repeatedly cautioned lower courts to proceed carefully in deciding excessive force cases at the summary judgment stage. In this regard, that court has explained:

> Because [the excessive force inquiry] nearly always requires a jury
> to sift through disputed factual contentions, and to draw inferences
> therefrom, we have held on many occasions that summary
> judgment or judgment as a matter of law in excessive force cases
> should be granted sparingly. This is because police misconduct
> cases almost always turn on the jury's credibility determinations.

Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002). See also Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); Lolli v. County of Orange, 351 F.3d 410, 415-16 (9th Cir. 2003).

1   II.  Deliberate Indifference to Serious Medical Needs

2        The court now turns to defendants' argument that they are entitled to summary judgment

3   in their favor on plaintiff's claim that the defendants were deliberately indifferent to his serious

4   medical needs.  Defense counsel argues that plaintiff cannot claim that defendants did not

5   summon medical attention for him because they did not know plaintiff needed medical attention.

6   Plaintiff was unaware his arm was broken, and plaintiff acknowledged during his deposition that

7   he said nothing to the escort officers about any injury.  (Defs.' Mem. of P. & A. at 13-14.)  In his

8   opposition to defendants' motion for summary judgment, plaintiff agrees that the court should

9   dismiss his deliberate indifference claim.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 18-19.)

10       Under these circumstances, the court should grant defendants' motion for summary

11  judgment on plaintiff's deliberate indifference claim.

12  III.  Qualified Immunity

13       Turning now to defendants' argument that they are entitled to qualified immunity, as

14  discussed above, viewing the evidence in a light most favorable to plaintiff as the court is

15  required to do on defendants' motion for summary judgment, defendants alleged pulling of the

16  retention chain resulting in plaintiff's broken arm was unnecessary and not done in good faith to

17  maintain or restore discipline in violation of plaintiff's rights under the Eighth Amendment.

18       Moreover, the state of the law in 2009, when the alleged constitutional violation took

19  place, would have given defendants fair warning that engaging in the such force was unlawful.

20  Specifically, since the Ninth Circuit's decision in Robins in 1995, prison officials have had ample

21  notice that the malicious or sadistic use of force with intent to cause harm is unlawful.

22       Accordingly, defendants' motion for summary judgment on the basis of qualified

23  immunity should be denied.

24                              **OTHER MATTERS**

25       In his opposition to defendants' motion for summary judgment, plaintiff requests that the

26  court deny defendants' motion for summary judgment or defer ruling on the motion until he is

27  able to conduct discovery.  In light of these findings and recommendations recommending that

28  defendants' motion for summary judgment be denied with respect to plaintiff's excessive use of

1  force claim, the court will deny plaintiff's motion to defer ruling on the defendants' motion for

2  summary judgment.

3        Also pending before the court is defendants' motion for sanctions pursuant to Rule 11 and

4  Rule 56(h) of the Federal Rules of Civil Procedure.  In that motion, defense counsel argues that

5  plaintiff has filed a declaration with his opposition to defendants' motion for summary judgment

6  that contains false statements made under penalty of perjury.  Specifically, counsel contends that

7  plaintiff's declaration contradicts aspects of his prior deposition testimony.  (Defs.' Mot. for

8  Sanctions at 2-11.)  Plaintiff has not opposed or otherwise responded to the motion.

9        First, a motion pursuant to Rule 11 has stringent notice and filing requirements.  See

10  Holgate v. Baldwin, 425 F.3d 671, 677 (9th Cir. 2005).  Specifically, Rule 11 includes a "safe

11  harbor" provision that the court strictly enforces.  See Fed. R. Civ. P. 11(c)(2) ("The motion must

12  be served . . . but it must not be filed or be presented to the court if the challenged paper, claim,

13  defense, contention, or denial is withdrawn or appropriately corrected within 21 days after

14  service. . . . "); Holgate, 425 F.3d at 677.  Here, there is no evidence that defendants complied

15  with the safe harbor requirement prior to moving for sanctions.  Accordingly, the court will deny

16  defendants' motion for Rule 11 sanctions.

17        As to defendants' motion for sanctions under Rule 56(h), that rule provides:

18          If satisfied that an affidavit or declaration under this rule is
            submitted in bad faith or solely for delay, the court – after notice
19          and a reasonable time to respond – may order the submitting party
            to pay the other party the reasonable expenses, including attorney's
20          fees, it incurred as a result.  An offending party or attorney may
            also be held in contempt or subjected to other appropriate sanctions.
21

22  Fed. R. Civ. P. 56(h).

23        "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an

24  affidavit contradicting his prior deposition testimony."  Kennedy v. Allied Mut. Ins. Co., 952

25  F.2d 262, 266 (9th Cir. 1991).  However, "the rule does not automatically dispose of every case in

26  which a contradictory affidavit is introduced to explain portions of earlier deposition testimony."

27  Id.  Rather, the concern is with "sham" testimony that flatly contradicts earlier testimony merely

28  to avoid summary judgment.  Id.

1     Here, the court will exercise its discretion and decline to award sanctions against plaintiff.

2     See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009) (courts should apply

3     the sham affidavit rule with caution).  Defense counsel has pointed to several inconsistencies

4     between plaintiff's declaration submitted in opposition to summary judgment and plaintiff's prior

5     deposition testimony.  Having reviewed plaintiff's declaration and deposition testimony in full,

6     however, the court cannot go so far as to make the factual determination required that these

7     contradictions amount to a "sham" produced to avoid summary judgment.  See id. ("the

8     inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

9     unambiguous to justify striking the affidavit"); Messick v. Horizon Indus., 62 F.3d 1227, 1231

10    (9th Cir. 1995) ("the non-moving party is not precluded from elaborating upon, explaining or

11    clarifying prior testimony elicited by opposing counsel on deposition.").  In fact, many of the

12    "false representations" defense counsel relies on in support of the pending motion for sanctions

13    concern plaintiff's interactions with Officer Ngo and Officer Wooden and do not even pertain

14    directly to defendant Prentice and Gomez's alleged excessive use of force at issue in this case.

15    Accordingly, the court will deny defendants' motion for sanctions.

**CONCLUSION**

17         Accordingly, IT IS HEREBY ORDERED that:

18         1.  Plaintiff's motion to defer ruling on the defendants' motion for summary judgment

19    (Doc. No. 47) is denied as unnecessary; and

20         2.  Defendants' motion for sanctions (Doc. No. 51) is denied.

21         IT IS HEREBY RECOMMENDED that:

22         1.  Defendants' motion for summary judgment (Doc. No. 40) be granted in part and

23    denied in part as follows:

24              a.  Defendants' motion for summary judgment on plaintiff's excessive use of force

25              claims be denied;

26              b.  Defendants' motion for summary judgment on plaintiff's deliberate

27              indifference medical care claims be granted; and

28    /////

25

1    2.  This matter be referred back to the undersigned for further proceedings on plaintiff's

2  excessive use of force claims against defendants Prentice and Gomez.

3    These findings and recommendations are submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8  objections shall be filed and served within seven days after service of the objections.  The parties

9  are advised that failure to file objections within the specified time may waive the right to appeal

10  the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  Dated:  June 5, 2014

12

13  _Dale A. Drozd_

DALE A. DROZD

14  UNITED STATES MAGISTRATE JUDGE

15  DAD:9
morr1544.57

16

17

18

19

20

21

22

23

24

25

26

27

28